AO 91 (Rev. 11/11)  Criminal Complaint

**LODGED**
CLERK, U.S. DISTRICT COURT
6/23/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: _____KM_____ DEPUTY

# UNITED STATES DISTRICT COURT
## for the
### Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT
6/23/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: ____clee____ DEPUTY

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No. 2:26-mj-03700 |
| Steven Zepeda, | ) |
| Laura Ortiz, and | ) Amended |
| Alexis Fragoso | ) |
| | ) |
| *Defendant(s)* | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____October 1, 2025_____ in the county of _____Los Angeles_____ in the _____Central_____ District of _____California_____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A) | (Possession with Intent to Distribute and Distribution of Methamphetamine) |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

/s/
*Complainant's signature*

Ani Ghaltakhchyan, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:    6/23/26

*Judge's signature*

Honorable Steve Kim, U.S. Magistrate Judge
*Printed name and title*

City and state:    Los Angeles, California

*AUSA:* Eric L. Mackie x3289

## **AFFIDAVIT**

I, Ani Ghaltakhchyan, being duly sworn, declare and state as follows:

## I.  **INTRODUCTION**

1.  I am a Special Agent ("SA") with the ATF and have been so employed since June of 2021.  I am currently assigned to the Glendale Field Office of the Los Angeles Field Division of ATF, which conducts investigations into violations of federal firearms, explosives, and narcotics laws.  My experience as an ATF SA includes, but is not limited to, conducting physical surveillance, executing search and arrest warrants, and participating in controlled drug/gun purchases using informants. I have experience investigating violations of federal statutes governing firearms and narcotics.  I have also conducted surveillance of persons trafficking firearms and illegal controlled substances, and persons possessing illegal firearms.

2.  As part of my training, I attended the Criminal Investigator and Special Agent Basic Training Academies for ATF at the Federal Law Enforcement Training Center in Glynco, Georgia for approximately 27 weeks.  This training included instruction on federal and state firearms and narcotics laws and regulations.  I graduated Magna Cum Laude with a Bachelor's degree in Criminal Justice and Law in Society from California State University, Los Angeles.  Additionally, I received a Master of Science in Criminology with a concentration in Global Criminology from San Jose State University.

## II. **PURPOSE OF AFFIDAVIT**

3.     This affidavit is made in support of criminal complaints against, and arrest warrants for:

a.     Steven Zepeda ("ZEPEDA") for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)(Possession with Intent to Distribute and Distribution of Methamphetamine);

b.     Laura Ortiz ("ORTIZ") for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)(Possession with Intent to Distribute and Distribution of Methamphetamine); and

c.     Alexis Fragoso ("FRAGOSO") for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)(Possession with Intent to Distribute and Distribution of Methamphetamine).

4.     This affidavit is also made in support of search warrants for:

a.      the premises located at 10416 Burin Ave, Inglewood, CA 90304 ("SUBJECT PREMISES 1") as described further in Attachment A-1;

b.     the premises located at 710 W 108th Street, Los Angeles, CA 90044 (SUBJECT PREMISES 2"), as described further in Attachment A-2;

c.     the premises located at 3707 W 111th St, Inglewood, CA 90303 ("SUBJECT PREMISES 3"), as described further in Attachment A-3;

d.     the person of ZEPEDA as described further in Attachment A-4;

e.     the person of ORTIZ as described further in Attachment A-5; and

2

f.    the person of FRAGOSO as described further in Attachment A-6.

5.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 922(a)(1) (Dealing in Firearms Without a License); 18 U.S.C. § 933(a)(1) (Firearms Trafficking); 26 U.S.C. § 5861(d) (Unlawful Possession of Certain Firearms); 18 U.S.C. § 371 (Conspiracy to Deal in Firearms Without a License); 21 U.S.C. § 841(a)(1) (Distribution, Manufacturing, and Possession of Controlled Substances); and 21 U.S.C. 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances), (the "Subject Offenses") as described more fully in Attachment B.  Attachments A-1 through A-6 and Attachment B are incorporated herein by reference.

6.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaints and warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.   Introduction to ZEPEDA and First Controlled Gun Buy at SUBJECT PREMISES 1**

7.   On or about September 29, 2025, a detective from the Los Angeles Police Department ("LAPD") contacted me and told me that an LAPD investigation developed evidence showing that ZEPEDA was selling guns illegally.[1]  Additionally, the detective provided me with two phones numbers used by ZEPEDA to conduct illegal gun sales.

8.   After receiving that information, I tasked an ATF CI (the "CI") with contacting ZEPEDA to buy guns.[2]  On or about September 30, 2025, the CI sent a text message to one of the numbers provided to me by the LAPD detective and ZEPEDA responded.  Later, in a series of text messages and phone conversations using coded language, ZEPEDA agreed to sell the CI a gun on October 1, 2025.

9.   On October 1, 2025, the CI contacted ZEPEDA via text message to confirm the agreed-upon transaction and ZEPEDA responded.  During the ensuing text exchange, the CI used coded language to ask ZEPEDA where he lives, and ZEPEDA responded with

---

[1] After learning ZEPEDA's identity, I caused an ATF Industry Operations Investigator to run ZEPEDA's name through the ATF's Federal Licensing System ("FLS"), which contains information on all federal firearms licenses issued by the federal government. Following that review, the investigator determined that ZEPEDA does not have a federal firearms license to sell guns in the United States.

[2] The CI has worked for ATF since 2011. S/he was previously convicted of Racketeer Influenced and Corrupt Organizations Act conspiracy in 2010, and possession of controlled substances in 1996 and 1997. The CI works in exchange for compensation, and ATF has paid him/her approximately $408,850.00 to date.

the address of SUBJECT PREMISES 1.  Then, the CI and ZEPEDA agreed to finalize the gun sale there.

10.  In advance of the gun sale at SUBJECT PREMISES 1, the CI met with law enforcement and was outfitted with a body-worn recording device.  Based on my review of the recording captured by that device, my conversations with other law enforcement agents/officers, and my own personal knowledge, I know the following:

a.   the CI arrived at SUBJECT PREMISES 1 around 3:00pm and parked his/her car in the driveway;

b.   the CI entered the house where s/he met with ZEPEDA and ZEPEDA handed the CI a Taurus model PT99 9mm pistol with an obliterated serial number and six rounds of 9mm ammunition in exchange for $1,000;

c.   the CI and ZEPEDA discussed (in substance and summary) the price for a quarter pound of methamphetamine, which ZEPEDA said sells for $850.

**B.   Second Controlled Gun Buy from ZEPEDA at SUBJECT PREMISES 1**

11.  Following that controlled transaction at SUBJECT PREMISES 1, I instructed the CI to maintain contact with ZEPEDA and the CI complied.  In a series of text messages and voice calls using coded language that took place between October 1, 2025, and October 6, 2025, ZEPEDA agreed to sell the CI additional guns at SUBJECT PREMISES 1 on October 6, 2025.

12.   In advance of the agreed-upon deal at SUBJECT PREMISES 1 on October 6, 2025, the CI met with law enforcement and was outfitted with a body-worn recording device.  Based on

5

my review of the recording captured by that device, my conversations with other law enforcement agents/officers, and my own personal knowledge, I know that the CI traveled to SUBJECT PREMISES 1 where he met with ZEPEDA and bought two rifles, a 9mm handgun outfitted with a machine gun conversion device, and approximately 150 rounds of ammunition in exchange for $4600.

**C.   Third Controlled Gun Buy from ZEPEDA at SUBJECT PREMISES 1**

13. Following that controlled transaction at SUBJECT PREMISES 1, I instructed the CI to maintain contact with ZEPEDA and the CI complied.  In a series of text messages and voice calls using coded language that took place between October 7, 2025, and October 8, 2025, ZEPEDA agreed to sell the CI an additional gun at SUBJECT PREMISES 1 on October 9, 2025.

14. In advance of the agreed-upon deal at SUBJECT PREMISES 1 on October 9, 2025, the CI met with law enforcement and was outfitted with a body-worn recording device.  Based on my review of the recording captured by that device, my conversations with other law enforcement agents/officers, and my own personal knowledge, I know that the CI traveled to SUBJECT PREMISES 1 where he met with ZEPEDA and bought a rifle and three rounds of ammunition in exchange for $2,000.

**D.   Fourth and Fifth Controlled Gun Buys from ZEPEDA at Location Controlled by ATF**

15. Following that controlled transaction at SUBJECT PREMISES 1, I instructed the CI to maintain contact with ZEPEDA and the CI complied.  As a result of those continued communications, ZEPEDA sold the CI and an ATF undercover agent

6

("UC-1") guns on two additional occasions: October 23, 2025, and November 13, 2025.[3]  Based on my review of recordings captured on those dates, my conversations with other law enforcement agents/officers, and my own personal knowledge, I know that:

     a.   on October 23, 2025, ZEPEDA sold the CI and UC-1 a rifle, one pistol, and approximately 97 rounds of ammunition in exchange for $2700; and

     b.   on November 13, 2025, ZEPEDA sold the CI and UC-1 a shotgun, approximately 145 rounds of ammunition, and a 3D printer (that ZEPEDA told the UC could print firearms) in exchange for $3,000.[4]

**E.    Introduction to ORTIZ and an Additional Controlled Gun Buy at SUBJECT PREMISES 1**

16.  On or about December 1, 2025, the CI received a call from telephone number 951-593-8112 (the "8112 Number") that s/he answered.  The caller identified herself as an associate of ZEPEDA (the "Caller"), and said (in substance and summary) that ZEPEDA was incarcerated and needed money for bail, so ZEPEDA tasked the Caller with contacting the CI to gauge the CI's interest in buying items that belonged to ZEPEDA.  The CI expressed interest, so the Caller and the CI ended their conversation with promises to be in contact in the future.

---

[3] The CI introduced UC-1 to ZEPEDA during the October 23, 2025, controlled buy at the ATF Undercover Location.

[4] Both of these transactions took place at a specified location that is controlled and used by ATF for controlled transactions like the ones described herein (the "ATF Undercover Location").

17.  After the CI reported his/her conversation with the Caller to me, I instructed the CI to maintain contact with the Caller and the CI complied.  Then, in a series of telephone calls and text messages using coded language that took place between December 1, 2025, and December 3, 2025, the Caller agreed to sell the CI a gun, ammunition, and a quarter pound of methamphetamine at SUBJECT PREMISES 1 on December 3, 2025.

18.  In advance of the agreed-upon deal at SUBJECT PREMISES 1 on December 3, 2025, the CI met with law enforcement and was outfitted with a body-worn recording device.  Based on my review of the recording captured by that device, my conversations with other law enforcement agents/officers, and my own personal knowledge, I know that:

a.   the CI drove his/her car to SUBJECT PREMISES 1, parked on the street in front of the residence, placed a call to the 8112 Number and the Caller answered;

b.   a short time after that call ended, a woman later identified as ORTIZ exited SUBJECT PREMISES 1, entered the CI's car, and sold the CI what appeared to be a quarter pound of methamphetamine in exchange for $500.[5]

---

[5] I queried law enforcement databases and discovered that the 8112 Number is associated with ORTIZ.  Then, I obtained a California Department of Motor Vehicles ("DMV") photograph of ORTIZ that I showed to the CI, who identified ORTIZ as the person who sold him/her drugs in front of SUBJECT PREMISES 1 on December 3, 2025.  After learning ORTIZ's identity, I caused an ATF Industry Operations Investigator to run ORTIZ's name through the ATF's FLS.  Following that review, the investigator determined that ORTIZ does not have a federal firearms license to sell guns in the United States.

19.  Later, I retrieved the suspected methamphetamine that ORTIZ sold the CI and sent it to the Drug Enforcement Administration Southwest Laboratory (the "Southwest Lab") for testing, which confirmed that the suspected methamphetamine was, in fact, 110.4 grams of actual methamphetamine.

**F.    ORTIZ Distributes Methamphetamine During Controlled Buy at the ATF Undercover Location**

20.  Following that controlled transaction at SUBJECT PREMISES 1, I instructed the CI to maintain contact with ORTIZ and the CI complied.  As a result of those continued communications, ORTIZ sold the CI and UC-1 drugs again on December 15, 2025, at the ATF Undercover Location.  Based on my review of recordings captured that day, my conversations with other law enforcement agents/officers, and my own personal knowledge, I know that ORTIZ sold the CI and UC-1 111.8 grams of actual methamphetamine (as confirmed by Southwest Lab testing) in exchange for $400.

**G.    Controlled Gun Buy With ORTIZ and Accomplice**

21.  Following that controlled transaction at the ATF Undercover Location, I instructed the CI to maintain contact with ORTIZ and the CI complied.  In a series of telephone calls and text messages using coded language that took place between December 17, 2025, and December 28, 2025, ORTIZ agreed to sell the CI more guns and drugs on December 29, 2025.  Then, on the afternoon of December 29, 2025, ORTIZ sent a text message to the CI where she asked to change the agreed-upon location of the deal when she said "[c]an u meet me somewhere else I cant make

9

it over their [sic] im getting a ride to the homies house were im gonna get everything from[.]"  When the CI replied and asked where that friend's house was located, ORTIZ sent a text that said "Imperial and Yukon[,]" which is the nearest intersection to the outbuilding that sits at the southernmost portion of the parcel of land located at 3540 W Imperial Hwy in Inglewood (the "Khan Premises").  Then, ORTIZ sent a text message that contained a digital link to the address 3544 W. Imperial Highway in Inglewood, which is a restaurant located next to the Khan Premises.  Following those exchanges, ORTIZ and the CI agreed to meet in the parking lot of an AutoZone located at 2876 West Imperial Highway (the "AutoZone") to complete the agreed-upon deal.[6]

22.  In advance of the agreed-upon deal at the AutoZone on December 29, 2025, the CI met with law enforcement and was outfitted with a body-worn recording device.  Based on my review of the recording captured by that device, my conversations with other law enforcement agents/officers, and my own personal knowledge, I know that:

a.   ORTIZ arrived at the AutoZone in a black BMW SUV bearing California License Plate 9SPW452 (the "BMW"), which was being operated by Farhan Khan ("Khan");[7]

---

[6] The AutoZone is just over a half mile away from the Khan Premises, and the drive between the two location takes approximately two minutes.

[7] During one of the controlled gun buys described herein, a law enforcement officer conducting surveillance captured a photograph of the driver of the BMW.  Then, an LAPD officer caused that picture to be run through facial recognition
*(footnote cont'd on next page)*

b.    after Khan parked the BMW, ORTIZ exited the car and entered the CI's car, where she sold the CI a Glock 27 40 caliber pistol, two rounds of ammunition, and 109.5 grams of actual methamphetamine (as confirmed by Southwest Lab testing) in exchange for $1900[8]; and

c.    following that exchange, ORTIZ re-entered the BMW and drove with Khan to the alley located behind the Khan Premises, where the pair exited the car and walked inside the Khan Premises.

## H.    Second Controlled Gun Buy with ORTIZ and Khan

23.    Following that controlled transaction at the AutoZone, I instructed the CI to maintain contact with ORTIZ and the CI complied.  In a series of telephone calls and text messages using coded language that took place between December 29, 2025, and January 6, 2026, ORTIZ agreed to sell the CI additional guns and drugs at the AutoZone on January 7, 2026.

24.    In advance of the agreed-upon deal at the AutoZone on January 7, 2026, law enforcement outfitted UC-1's undercover car with a recording device.  Based on my review of the recording captured by that device, my conversations with other law enforcement agents/officers, and my own personal knowledge, I know that:

---

software, which identified person captured in that photograph as KHAN.  Subsequently, I obtained a photograph of Khan from one of his previous arrests and provided UC-1 with the photograph. UC-1 confirmed Khan's identity.

[8] During this exchange, ORTIZ told the CI that her source of drug supply had "a lot more," available for purchase.

11

a.    ORTIZ and Khan departed from the Khan Premises, entered the BMW, then drove together to the AutoZone;

b.    after Khan parked the SUBJECT VEHICLE, ORTIZ exited the car and entered UC-1's car, where she sold UC-1 and the CI a Ruger 9mm caliber pistol, 11 rounds of ammunition, and 132.9 grams of actual methamphetamine (as confirmed by Southwest Lab testing) in exchange for $1900;

c.    during that exchange, the CI asked ORTIZ whether she could sell fully automatic firearms or machine gun conversion devices and ORTIZ said "I will ask him right now and I'll let you know," (in an apparent reference to Khan);

d.    following that exchange, ORTIZ re-entered the BMW and approximately a minute later sent a series of text messages to the CI that read "[h]e said to make a list[,]" "[o]f what you need," "[h]e said he can get anything u need just to send me a list[,]" (again in an apparent reference to Khan); and

e.    ORTIZ drove with Khan to the area near the Khan Premises, where the pair exited the car and walked inside the Khan Premises.

## I.    Third Controlled Gun Buy With ORTIZ and Khan

25.   Following that controlled transaction at the AutoZone, I instructed the CI to maintain contact with ORTIZ and the CI complied.  In a series of telephone calls and text messages using coded language that took place between January 7, 2026, and January 15, 2026, ORTIZ agreed to sell the CI more guns at the AutoZone on January 15, 2026.

12

26.  In advance of the agreed-upon deal at the AutoZone on January 15, 2026, law enforcement outfitted UC-1's undercover car with a recording device.  Based on my review of the recording captured by that device, my conversations with other law enforcement agents/officers, and my own personal knowledge, I know that:

a.  ORTIZ and Khan arrived to the AutoZone parking lot together in the BMW;

b.  after Khan parked the BMW, ORTIZ exited the car and entered UC-1's car, where she sold UC-1 and the CI a Ruger .45 caliber pistol, a Smith & Wesson .40 caliber pistol, an A.A. Arms 9mm caliber pistol, and approximately 82 rounds of ammunition in exchange for $4800;

c.  during that exchange, UC-1 and the CI asked ORTIZ if "he could get ARs" (referring to Khan) and ORTIZ stated "he" does, but that "he gets rid of them right away";

d.  following that exchange, UC-1 asked ORTIZ if s/he could meet Khan, and ORTIZ said "no, he's real fishy."

## J.  ZEPEDA Reestablishes Contact and Distributes Cocaine and More Drugs

27.  After ZEPEDA sold the CI and the UC two handguns and approximately 100 rounds of ammunition in a controlled transaction that took place in the UC's car on January 13, 2026, I instructed the CI to maintain contact with ZEPEDA and the CI complied.[9]  In a series of telephone calls and text messages

---

[9] The January 13 deal was initiated when the CI received an unsolicited call from ZEPEDA on or about January 1, 2026, where
*(footnote cont'd on next page)*

using coded language that took place between January 14, 2026, and January 26, 2026, ORTIZ agreed to sell the CI half a pound of cocaine at the ATF Undercover Location on January 26, 2026.

28.  Based on my review of recordings captured that day, my conversations with other law enforcement agents/officers, and my own personal knowledge, I know that ZEPEDA sold the CI and another ATF undercover agent ("UC-2") 502.3 grams of a mixture and substance containing a detectable amount of cocaine (as confirmed by Southwest Lab testing) in exchange for $2000.

### K.    Controlled Gun Buy With an Unaccompanied ORTIZ

29.  Following the controlled transaction at the AutoZone on January 15, 2026, I instructed the CI to maintain contact with ORTIZ and the CI complied.  As a result of those continued communications, ORTIZ sold the CI and UC-1 two additional guns on January 23, 2026.  Based on my review of recordings captured on that date, my conversations with other law enforcement agents/officers, and my own personal knowledge, I know that the deal took place at a parking lot located on the 12000 block of Sheldon Street in Los Angeles where ORTIZ sold the CI and UC-1 a Taurus 9mm caliber pistol and a Radical Firearms rifle in exchange for $3600.

### L.    Fourth Controlled Gun Buy with ORTIZ and Khan

30.  Following that deal, I instructed the CI to maintain contact with ORTIZ and the CI complied. In a series of telephone

---

ZEPEDA told the CI (in substance and summary) that he had just been released from jail wanted to sell the CI more guns so he could get "back on his feet."  Additionally, ZEPEDA told the CI using coded language that he was no longer working with ORTIZ because she "did [him] dirty."

calls and text messages using coded language that took place between January 23, 2026, and February 4, 2026, ORTIZ agreed to sell the CI one long gun and six handguns at the AutoZone on January 4, 2026.

31.   In advance of the agreed-upon deal at the AutoZone on February 4, 2026, law enforcement outfitted UC-1's undercover car with a recording device.  Based on my review of the recording captured by that device, my conversations with other law enforcement agents/officers, and my own personal knowledge, I know that:

a.   ORTIZ and Khan arrived to the AutoZone parking lot together in the BMW;

b.   after Khan parked the BMW next to UC-1's car, ORTIZ exited the BMW and obtained a shotgun wrapped in a blanket from the rear of the car;

c.   after ORTIZ handed the blanket-wrapped shotgun to UC-1, she returned to the BMW, grabbed a backpack from the car, and entered the UC's car;

d.   once inside the UC's car, ORTIZ pulled three boxes with four handguns inside out of the backpack;

e.   ORTIZ exhibited confusion about the number of guns she brought to the deal (as noted above, she previously agreed to bring six total guns to the deal), so she exited UC-1's car, reapproached the BMW and opened the rear passenger door where she appeared to have a conversation with Khan;

f.   following that conversation, ORTIZ returned to UC-1's car and asked how many guns were present and when UC-1

15

replied, ORTIZ returned to the BMW and appeared to have another conversation with Khan;

g.    after ORTIZ completed her conversation with Khan, ORTIZ reentered UC-1's car and sold UC-1 and the CI a SCCY 9mm caliber pistol, a Stoeger 9mm caliber pistol, a Rock Island Armory 9mm caliber pistol, and a Remington 12-gauge shotgun in exchange for $6600; and

h.    after the deal was complete, Khan and ORTIZ drove back to the Khan Premises and went inside.

## M.    ZEPEDA Distributes Methamphetamine and More Guns During Controlled Buy at ATF Undercover Location

32.    After the deal with ZEPEDA at the ATF Undercover Location on January 26, 2026, I instructed the CI to maintain contact with ZEPEDA and the CI complied.  In a series of telephone calls and text messages using coded language that took place between January 27, 2026, and February 24, 2026, ZEPEDA agreed to sell the CI additional guns and half a pound of methamphetamine at the ATF Undercover Location February 24, 2026.

33.    Based on my review of recordings captured that day, my conversations with other law enforcement agents/officers, and my own personal knowledge, I know that ORTIZ sold the CI and UC-1: 1) a Smith & Wesson 9mm caliber pistol, 2) a 5.56 caliber rifle of unknown manufacturer, model, and serial number, 3) approximately 239 rounds of ammunition, and 4) 229.2 grams of actual methamphetamine (as confirmed by Southwest Lab testing) in exchange for $4100.

16

**N.    Controlled Gun Buy with ORTIZ Leads to Identification of SUBJECT PREMISES 2**

34.    Following that controlled transaction with ORTIZ and KHAN at the AutoZone on February 4, 2026, I instructed the CI to maintain contact with ORTIZ and the CI complied.  In a series of telephone calls and text messages using coded language that took place between February 24, 2026, and March 19, 2026, ORTIZ agreed to sell the CI more guns at SUBJECT PREMISES 2 on March 19, 2026.[10]

35.    In advance of the agreed-upon deal at SUBJECT PREMISES 2 on March 19, 2026, law enforcement outfitted UC-1's undercover car with a recording device.  Based on my review of the recording captured by that device, my conversations with other law enforcement agents/officers, and my own personal knowledge, I know that:

a.    the CI and UC-1 drove to SUBJECT PREMISES 2, where they parked on the street outside the house;

b.    after the CI and UC-1 parked, the CI sent a text message to ORTIZ and she replied by stating "shit im picking them up down the street [sic]", and "im waiting in this stupid ass guy but i have 2 of them their in the house so y wont be waiting im gonna have my nephew give them to u [sic]";

c.    eventually, a man exited SUBJECT PREMISES 2, entered UC-1's car, and handed UC-1 a black bag that contained a

---

[10] I reviewed law enforcement databases and discovered that ORTIZ lists SUBJECT PREMISES 3 as her home address with the California Department of Motor Vehicles.

9mm pistol of unknown manufacturer, model, and serial number, and 15 rounds of ammunition for $4300.

O.   **Introduction of FRAGOSO and Controlled Gun Buy in Compton**

36.   On or about April 1, 2026, the CI received a text message from ZEPEDA that said, "[m]y cousin Alexis is gonna hit you up. He has some brand new things in a box for you."  Then, on or about April 3, 2026, ZEPEDA called the CI and told the CI his cousin (later identified as FRAGOSO) was on the line.[11] During that conversation, FRAGOSO agreed to sell the CI two rifles that belonged to FRAGOSO's "buddy."  Then, in a series of text messages and telephone conversations using coded language that took place between April 4, 2026, and April 8, 2026, FRAGOSO agreed to finalize that deal at a house on the 600 block of Grandee Avenue (the "Grandee Avenue House") in Compton on April 8, 2026.

37.   In advance of that agreed-upon deal, law enforcement outfitted UC-1's undercover car with a recording device.  Based on my review of the recording captured by that device, my conversations with other law enforcement agents/officers, and my own personal knowledge, I know that:

---

[11] As described below, FRAGOSO delivered participated in several controlled drug/gun buys.  During one of those buys, a law enforcement officer conducting surveillance captured a photograph of FRAGOSO.  Then, an LAPD officer caused that picture to be run through facial recognition software, which identified person captured in that photograph as FRAGSOO.  After learning FRAGOSO's identity, I caused an ATF Industry Operations Investigator to run FRAGOSO's name through the ATF's FLS. Following that review, the investigator determined that FRAGOSO's name does not have a federal firearms license to sell guns in the United States.

a.   UC-1 and the CI drove to the Grandee Avenue House and saw FRAGOSO sitting inside a black Toyota Camry (the "Camry");

b.   UC-1 and the CI drove up to the Camry where FRAGOSO instructed them to follow him in the Camry; and

c.   FRAGOSO drove the car nearby and parked, then entered UC-1's car where he sold UC-1 and the CI two Spike's Tactical rifles in exchange for $4200.

## P.   FRAGOSO Distributes Methamphetamine and More Guns During Controlled Buy

38.   Following that transaction, I instructed the CI to maintain contact with FRAGOSO and the CI complied.  In a series of telephone calls and text messages using coded language that took place between April 8, 2026, and April 23, 2026, FRAGOSO agreed to sell the CI more guns and a quarter pound of methamphetamine on April 23, 2026, at a restaurant located on the 11000 block of Crenshaw Boulevard in Inglewood.

39.   In advance of that agreed-upon deal, law enforcement outfitted UC-1's undercover car with a recording device.  Based on my review of the recording captured by that device, my conversations with other law enforcement agents/officers, and my own personal knowledge, I know that:

a.   before breaking contact with law enforcement, the CI sent a text message to FRAGOSO and asked to move the location of the deal to the parking lot of the AutoZone and FRAGOSO agreed;

19

b.   the CI and UC-1 drove to the AutoZone parking lot and parked;

c.   approximately 10 minutes after the CI and UC-1 parked, FRAGOSO drove into the AutoZone parking lot and parked near the UC's car;

d.   FRAGOSO walked from his truck carrying what appeared to be a rifle bag and entered the UC's car, where FRAGOSO handed UC-1 a clear plastic bag with a red cup inside that contained 108.1 grams of actual methamphetamine (as confirmed by Southwest Lab testing);

e.   UC-1 opened the rifle bag that FRAGOSO was carrying and saw that it contained a Marlin Firearms Co. 30-30 caliber rifle; and

f.   UC-1 paid FRAGOSO $1500 for the rifle and the methamphetamine.

g.   After the completion of the transaction, FRAGOSO exited the UC car and entered his truck.  LAPD surveillance units observed FRAGOSO exit the AutoZone parking lot and drive northbound on Crenshaw Blvd.  About 10 minutes later, LAPD AirSupport observed FRAGOSO park his truck near 3707 W 111th St, Inglewood, CA 90303 ("SUBJECT PREMISES 3"), and walk towards the front door.  A few minutes later, FRAGOSO exited SUBJECT PREMISES 3, approached his truck, opened the hood, and appeared to work on the vehicle.

20

**Q.    FRAGOSO Distributes a Gun and Methamphetamine in Second Controlled Buy**

40.    Following that transaction, I instructed the CI to maintain contact with FRAGOSO and the CI complied.  In a series of telephone calls and text messages using coded language that took place between April 25, 2026, and April 29, 2026, FRAGOSO agreed to sell the CI more guns and a quarter pound of methamphetamine on April 29, 2026, at the parking lot of the AutoZone.

41.    Based on my review of the recording captured by that device, my conversations with other law enforcement agents/officers, and my own personal knowledge, I know that FRAGOSO met with the CI and UC-1 in the UC's car in the AutoZone parking lot and sold them a short-barreled rifle and 108.57 grams of actual methamphetamine (as confirmed by Southwest Lab testing) in exchange for $4000.[12]

**R.    FRAGOSO Distributes a Gun and Methamphetamine in Third Controlled Buy**

42.    Following that transaction, I instructed the CI to maintain contact with FRAGOSO and the CI complied.  In a series of telephone calls and text messages using coded language that took place between April 29, 2026, and May 11, 2026, FRAGOSO agreed to sell the CI more guns and a quarter pound of

---

[12] After FRAGOSO exited UC-1's car, he mounted an e-bicycle and rode out of the AutoZone parking lot.  Law enforcement maintained surveillance on FRAGOSO and approximately 15 minutes later saw him on the walkway of the property at 3540 W Imperial Highway in Inglewood (the location of the Khan Premises), where he appeared to have a conversation with Khan.

methamphetamine on May 11, 2026, at the parking lot of the AutoZone.

43. In advance of that agreed-upon deal, the CI met with law enforcement and was outfitted with a body-worn recording device. Based on my review of the recording captured by that device, my conversations with other law enforcement agents/officers, and my own personal knowledge, I know that FRAGOSO met with the CI in the CI's car in the AutoZone parking lot and sold the CI a short-barreled shotgun, 19 rounds of ammunition and 53.80 grams of actual methamphetamine (as confirmed by Southwest Lab testing) in exchange for $1,000.

IV. **Additional Surveillance Confirms SUBJECT PREMISES 3 as Residence for FRAGOSO:**

44. On or about June 5, 2026, at approximately 5:30 a.m. while conducting surveillance, LAPD units observed a black Audi SUV, bearing CA license plate 8UPJ215 park in the driveway of SUBJECT PREMISES 3. FRAGOSO exited from the driver seat and an unidentified female (UF) exited from the front passenger seat. Both FRAGOSO and the UF entered SUBJECT PREMISES 3 through the front entrance.

45. At approximately 5:45 a.m., Officer Vernon observed FRAGOSO exit the front entrance of SUBJECT PREMISES 3 and walk towards the Audi. FRAGOSO opened the driver's side door, reached inside, then exited. FRAGOSO re-entered SUBJECT PREMISES 3 through the front entrance.

## V.  <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

46.  From my training and experience, previous arrests, and the collective experiences related to me by other law enforcement personnel who conduct firearms investigations, I am aware of the following:

a.  Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.

b.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

c.  Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  These records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences or stash houses.  They often maintain these records in their residences or stash houses for months or years at a time. It is common, for example, for narcotics traffickers to keep pay/owe sheets or other papers of narcotics sold and monies owed.  Such pay/owe sheets or papers are used as a basis for accounting and for settling existing debts.  Such records are often maintained for a substantial period of time even after the debts are

23

collected. Such records are invaluable to narcotics traffickers and such records are rarely discarded.  Such records and pay/owe sheets also frequently include the names, identities and telephone numbers of suppliers, customers and co-conspirators.

d.    Individuals involved in narcotics trafficking must often rely on others to obtain their drugs and to help them market the narcotics.  Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residences or stash houses.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residences and stash houses, including in the form of calendar entries and location data.

e.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

f.    Individuals involved in narcotics trafficking commonly earn income in the form of cash and try to legitimize

24

these profits.  To do this, traffickers frequently attempt to secrete, transfer and conceal the money by means, including, but not limited to: placing assets in names other than their own to avoid detection while maintaining control; laundering the money through what appears to be a legitimate business or businesses; hiding money in their homes, safes and safety deposit boxes; or using the money to buy assets which are difficult to trace. Records of these and other types of transactions are often found at the residences, stash houses, and/or digital devices of individuals involved in narcotics trafficking.

g.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences, vehicles, or stash houses.  Additionally, individuals involved in narcotics trafficking often amass and maintain assets at their residences or stash houses, which were generated by their trafficking activities, or purchased with the cash earned from such trafficking.

h.   Residences and stash houses used by individuals involved in narcotics trafficking usually contain articles of personal property evidencing the identity of person(s) occupying, possessing, residing in, owning, frequenting or controlling the residence and premises.

i.   Drug traffickers often use multiple vehicles to transport their narcotics and may keep stashes of narcotics in

25

their vehicles in the event of an unexpected opportunity to sell narcotics arises.

j.    Drug traffickers also regularly carry firearms during and in connection with their drug trafficking activities. For example, drug traffickers may possess a firearm to protect their stash or fend off robbery attempts.  In my career, I have regularly encountered drug traffickers possessing firearms for a similar purpose.

k.    Drug traffickers often keep drugs in places where they have ready access and control, such as at their residences, at their stash houses, or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking.  These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

l.    Individuals involved in drug trafficking often maintain several digital devices, including cellular telephones, computers, tablets, and other communication devices, at their residences, residences of associates, stash houses, places of business, in their vehicles, and/or on their person for the purpose of arranging transactions.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones" or "burner phones," for actual

26

voice communications.  Persons attempting to arrange for the sale, purchase, transportation and manufacture of controlled substances frequently will contact their illegal business customers, purveyors, and associates to negotiate business deals.  Further, it has been my experience that those involved in drug trafficking maintain contact information for other coconspirators in their cellular telephones.

m.    The above-described documents are often possessed by narcotics dealers and manufacturers much the same way a legitimate business will maintain records and tools of its trade whether or not the business has a particular item in inventory on a given date.  These documents are kept by narcotics dealers whether or not the dealer is in possession of any drugs or chemicals at any given moment.

## VI. <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

47.  From my training and experience, previous arrests, and the collective experiences related to me by other law enforcement personnel who conduct firearms investigations, I am aware of the following:

a.    Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence or homes frequently used by them, or in places that are readily accessible, and under their physical control, such in their digital devices or vehicles. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms

to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices or readily accessible in their homes or vehicles.

b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.   Firearm traffickers often keep firearms in places where they have ready access and control, such as at their residences, in their cars, or in homes frequently used or accessed by them.  They also often keep other items related to their firearm trafficking activities at their residences, in their cars, or in homes frequently used or accessed by them, such as ammunition, firearm accessories, packaging materials, and proceeds of firearm trafficking.  These items are often small enough to be easily hidden and thus may be kept at a firearm trafficker's residence, cars, or homes frequently used by them even if the firearm trafficker lives with others who may be unaware of his criminal activity.

d.   Those who illegally possess firearms often also sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and

28

the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that they sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

e.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

f.    Firearms traffickers use their vehicles to transport weapons, store receipts, and meet with customers. Cars are also often used to conceal contraband because they have compartments (for example, under seats, within trunks, in the engine cavity) that provide quick access for the firearms trafficker but are less likely to be discovered accidentally by others in a home.

### VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

48.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, among others, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have

29

been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remains on the hard drive until it is overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later;

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence;

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the

device was being controlled remotely by such software; and

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted;

e.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises, person, or car for a number of reasons, including the following:

i.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required; and

ii.    Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an

31

average size of 1.5MB.

49.    The search warrants request authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of

32

the warrants: (1) depress ZEPEDA's, ORTIZ's, and/or FRAGOSO's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of ZEPEDA's, ORTIZ's, and/or FRAGOSO's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

## VIII.    CONCLUSION

50.  For all the reasons described above, there is probable cause to believe that ZEPEDA, ORTIZ, and FRAGOSO violated 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)(Possession with Intent to Distribute and Distribution of Methamphetamine).

51.  Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found in SUBJECT PREMISES 1, SUBJECT PREMISES 2, SUBJECT PREMISES 3 and on the persons of ZEPEDA, ORTIZ, and FRAGOSO, as described in Attachments A-1 through A-6.

/s/
_____
Ani Ghaltakhchyan
Special Agent
Bureau of Alcohol, Tobacco,
Firearms and Explosives

Subscribed to and sworn before me
this 23nd day of June, 2026.

_____
THE HONORABLE STEVE KIM
UNITED STATES MAGISTRATE JUDGE